IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON GRIEGO and JAMES SANCHEZ, | CIVIL NO. 15-00122 SOM-KJM |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| COUNTY OF MAUI; ANSELM YAZAKI; ALY MIYASHIRO; MYLES S. WON; DOE OFFICERS 2-15, | |
| Defendants. | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION.**

Before the court is Defendants' motion for summary judgment as to Plaintiffs' federal claims under 42 U.S.C. § 1983 alleging violations of the Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments of the United States Constitution, and Plaintiffs' state claims alleging false imprisonment or false arrest, intentional infliction of emotional distress, and negligence.

This court grants summary judgment to Defendant County of Maui as to all § 1983 claims. With respect to the § 1983 claims against individual Defendants, this court grants summary judgment to individual Defendants on the claims relating to alleged violations of the Fifth, Eighth, and Ninth Amendments,

1

as well as with respect to any alleged violation of the Fourth
Amendment relating to the fact of Plaintiffs' arrests.  The
court denies summary judgment to individual Defendants with
respect to § 1983 claims relating to alleged Fourth Amendment
violations concerning the manner of the arrests and concerning
the searches for guns.[1]

Summary judgment is granted to all Defendants on the
state law claims of false imprisonment/false arrest.  Summary
judgment is granted to the County on the negligent
training/supervision/discipline claim.

With respect to the claim of negligence against
individual Defendants and the claim of respondeat superior
liability on the part of the County, summary judgment is denied
to the extent those claims relate to the manner of the arrests
and the searches for guns.  In all other respects, summary

---

[1]    Although the Second Amended Complaint also asserts
Fourteenth Amendment violations, nothing in that document or in
papers opposing the present summary judgment motion relates
specifically to the Fourteenth Amendment.  This court therefore
reads the reference to the Fourteenth Amendment as included only
for purposes of asserting that the federal rights set forth in
other amendments listed by Griego and Sanchez apply to states
and municipalities.  *See, e.g.*, *Mapp v. Ohio*, 367 U.S. 643, 655
(1961) (stating that Fourth Amendment was made applicable to
states via Fourteenth Amendment).  That is, Griego and Sanchez
do not appear to be arguing a Fourteenth Amendment violation
separate from a violation of another amendment.  This court
therefore does not address the Fourteenth Amendment claim
separately.

judgment is granted on the negligence and respondeat superior
claims.

Finally, with respect to the claim of intentional
infliction of emotional distress, summary judgment is denied
with respect to emotional distress relating to any claim that
remains for further adjudication, but granted with respect to
any emotional distress relating to matters disposed of by this
order.

## II.       BACKGROUND.[2]

David Maniatis called 911 to report that two men had
held him up at his home in Wailea, Maui, on July 14, 2013.
After speaking with Maniatis and several of his employees, Maui
Police Department officers arrested Plaintiffs Jason Griego and
James Sanchez for Burglary in the First Degree.  The officers
also searched Griego's and Sanchez's hotel rooms for weapons.
Griego and Sanchez were booked but ultimately released from
custody.

### A.    Events Leading Up to Arrests on July 14, 2013.

Griego and Sanchez are long-time law enforcement
officers from New Mexico.  They came to Maui in early July 2013

---

[2]     This section does not reflect any factual finding by
this court.  It contains general background information to
provide context for this court's analysis.  This court construes
all disputed facts in the light most favorable to Plaintiffs.
*See Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

to provide security for Maniatis at his home.  *See* Plaintiffs'
Opposition to Motion for Summary Judgment, Exhibit 8, ECF No.
117-9, PageID # 735; Exhibit 9, ECF No. 117-10, PageID # 746.
Griego and Sanchez had been providing security at one of
Maniatis's land development projects on the mainland.  *See* ECF
No. 117-9, PageID # 735; ECF No. 117-10, PageID # 746.  Griego,
Sanchez, and their families stayed at Maniatis's home from the
time they arrived on Maui until about July 11, 2013.  *See* ECF
No. 117-9, PageID # 736; ECF No. 117-10, PageID # 747.

        According to Griego and Sanchez, Maniatis was erratic
and acted bizarrely during their stay.  *See* Plaintiffs'
Opposition, Exhibit 11, ECF No. 117-12, PageID # 756; ECF No.
117-9, PageID # 736; ECF No. 117-10, PageID # 747.  They
eventually moved their families to a nearby hotel and agreed to
rotate security shifts at Maniatis's home.  *See* ECF No. 117-12,
PageID # 756; ECF No. 117-9, PageID # 736; ECF No. 117-10,
PageID # 747.  While upset about this situation, Maniatis told
them he would pay for their hotel rooms.  *See* ECF No. 117-9,
PageID # 736; ECF No. 117-10, PageID # 747.  He also asked if
his son could stay with them and their families at the hotel.
*See* ECF No. 117-9, PageID # 736; ECF No. 117-10, PageID # 747.
Maniatis's son ended up staying at the hotel until July 12,

2013.  *See* ECF No. 117-9, PageID # 736-37; ECF No. 117-10,
PageID # 747.

Griego and Sanchez say that Maniatis told them to take
some time off and promised to contact them later to set up a
meeting.  *See* ECF No. 117-9, PageID # 737; ECF No. 117-10,
PageID # 747.  They say that, on July 13, 2013, one of
Maniatis's employees in New Mexico telephoned Griego to tell him
and Sanchez to meet Maniatis at his house before they left Maui.
*See* ECF No. 117-9, PageID # 737; ECF No. 117-10, PageID # 747-
48.  On July 14, 2013, this same employee allegedly repeated
this instruction and told Griego that he and Sanchez should go
to Maniatis's house.  *See* ECF No. 117-9, PageID # 737.  Griego
and Sanchez say that, before going to Maniatis's house, they
stopped at an ABC store to buy "going away gag gifts" for
Maniatis, including a bottle of wine, some cigars, and an orange
t-shirt.  *See* ECF No. 117-8, PageID # 737; ECF No. 117-9,
PageID # 748.

**B.   Incident at Maniatis's House on July 14, 2013.**

There are varying accounts of what happened at
Maniatis's home on July 14, 2013.

According to Griego and Sanchez, they entered
Maniatis's property through the side gate they had normally used
during their time on Maui.  *See* ECF No. 117-9, PageID # 737; ECF

5

No. 117-10, PageID # 748. No one was sitting at the front gate, and music was playing loudly. *See* ECF No. 117-9, PageID # 737; ECF No. 117-10, PageID # 748. They say Maniatis initially seemed startled when he saw them, then laughed and hugged them. *See* ECF No. 117-9, PageID # 737; ECF No. 117-10, PageID # 748. The three men talked together, and Griego asked Maniatis if he was alone and where his security was. *See* ECF No. 117-9, PageID # 737; ECF No. 117-10, PageID # 748. Maniatis allegedly looked around, became angry, walked to a side room where some of his employees were, and asked them why no one had noticed that Griego and Sanchez had arrived. *See* ECF No. 117-9, PageID # 737; ECF No. 117-10, PageID # 748. Maniatis reportedly then told Griego and Sanchez that he had too much going on at that time, wanted to meet them in New Mexico, and "just wanted to make sure everything was good with them." *See* ECF No. 117-9, PageID # 737-38; ECF No. 117-10, PageID # 748. Maniatis asked them to leave, and they left through the front door with what they say was their understanding that they would speak to Maniatis when they were back in New Mexico. *See* ECF No. 117-9, PageID # 738; ECF No. 117-10, PageID # 748.

After Griego and Sanchez left, Maniatis called 911. *See* Defendants' Motion for Summary Judgment, Exhibit J, ECF No. 111-10, PageID #s 498-99; Exhibit K, ECF No. 111-11,

PageID #s 500-01.  The 911 call record shows that, at 7:22 p.m. on July 14, 2013, the Maui Police Department received a 911 call from Maniatis stating that two people armed with guns "went through security guards and held him up in his house."  *See* ECF No. 111-11, PageID # 500.  The dispatcher reported that, in the background of the 911 call, a woman could be heard saying that she did not want police at the house.  *See id*.  Maniatis then reportedly said, "Never mind I will just talk to you later," and the 911 call disconnected.  *See id.*  Given the disconnected call, the dispatcher sent Officers Ryan Nagata and Anselm Yazaki to Maniatis's house.  *See id.*, PageID # 501.

Officers Nagata and Yazaki interviewed Maniatis and his employees, Marvin Miles and Edward Opiana, at the house. *See* Defendants' Motion, Exhibit E, ECF No. 111-5, PageID #s 469-71; Exhibit S, ECF No. 111-19, PageID #s 526-27.  Officer Yazaki later interviewed Christopher Matson, another one of Maniatis's Maui employees, by telephone.  *See* ECF No. 111-5, PageID #s 469-71.  Officer Geste Ornellas, Officer Aly Miyashiro, and Sergeant Myles Won later joined Officers Nagata and Yazaki at the house to assist in the investigation.  Defendants' Motion, Exhibit RR, ECF No. 111-44, PageID # 632; Exhibit T, ECF No. 111-20, PageID # 529; Exhibit F, ECF No. 111-6, PageID # 478.

7

In their reply brief, Defendants object to
consideration by this court of the police reports and expert
report attached to Plaintiffs' opposition. *See* Defendants'
Reply, ECF No. 118, PageID # 804. Defendants contend that the
attachments are inadmissible hearsay. *See id.* It is this
court's understanding that the alleged hearsay consists of what
Maniatis and his employees allegedly told the officers. The
court considers the police reports for the narrow purpose of
examining whether the police had probable cause to arrest
Plaintiffs and to search their room and belongings. The reports
are the officers' summaries, offered against the officers. They
are not sufficient on their own to establish probable cause (and
Defendants themselves are not relying on them to do so), but
they could show an absence of probable cause. With respect to
alleged statements by Miles, Opiana, and Matson, all employed by
Maniatis, this court has before it their declarations.
Deposition testimony and interrogatory responses by Griego and
Sanchez are also before the court. This court does not have any
direct statement by Maniatis, but the record does include notes
of a 911 call from Maniatis's house.

Defendants' hearsay objections to the police reports
could apply with equal force to Defendants' own submissions of
the officers' declarations, which contain summaries of what they

were allegedly told. This court considers all the materials submitted not to resolve disputed facts, but to consider whether there was probable cause to arrest and search Griego and Sanchez. In other words, the court is focused on what the officers were told or understood, not on whether the statements or understandings were true.

At the hearing, Plaintiffs' counsel agreed that the court could ignore the expert report because certain portions were missing. For purposes of deciding this motion, this court does not consider Plaintiffs' expert report.

From Maniatis, Officer Yazaki learned that Maniatis had hired Griego and Sanchez as well as others on Maui to provide armed security at his house. *See* ECF No. 111-5, PageID # 470. Maniatis allegedly said that Griego and Sanchez quit on July 13, 2013, and that he told them to take their belongings from his house and not to return. *See id*. Maniatis allegedly told Officer Yazaki that he asked an employee, Christopher Matson, to call Griego and tell him that he and Sanchez were no longer welcome at the Maniatis home and should not return. *See id.* According to Officer Yazaki, Maniatis said that Matson did contact Griego on July 13, 2013. *See id.*

Maniatis allegedly told Officer Yazaki that Griego and Sanchez snuck up on him, grabbed his wrists, and placed them

behind his back. *See* Plaintiffs' Opposition, Exhibit 1, ECF No.
117-2, PageID # 716. Maniatis allegedly said that Griego and
Sanchez had made him feel "scared and threatened," and that he
believed they had come to his house to scare or harass him. *See*
*id.* Officer Yazaki reported that Maniatis said Griego and
Sanchez had handguns at their waists but did not draw or
threaten anyone with the weapons. *See id.* Maniatis allegedly
said that, after they let go of his wrists, he went to another
room to get Opiana and Miles. *See id.* Maniatis then allegedly
returned to the kitchen and saw Griego and Sanchez drinking
whiskey. *See id.* Maniatis reported that he asked them to
leave, and they did so through the front door. *See id.*

Officer Yazaki wrote an arrest report stating:

> [Griego] was told to stay away from the residence
> and not to return. [Griego] returned and grabbed
> the victim David MANIATIS by the left and right
> wrist and held his arms behind his back and told
> MANIATIS 'where is your security now.' [Griego]
> also told MANIATIS 'we can get you at anytime.'
> The victim felt threatened by the remarks told to
> him.

Defendants' Motion, Exhibit GG, ECF No. 111-33, PageID # 582.

Officer Nagata interviewed Opiana, who said he was
surprised to see Griego and Sanchez patting Maniatis on the back
as if they were greeting him, because Opiana had not even
noticed that they had come to the house. *See* Plaintiffs'
Opposition, Exhibit 2, ECF No. 117-3, PageID # 723; *see also*

10

Defendants' Motion, Exhibit R, ECF No. 111-18, PageID # 524.
Opiana was cleaning the dining room while Maniatis was in the
kitchen. *See* ECF No. 117-3, PageID # 723. Miles was in the
computer room, and Maniatis's son was in his bedroom. *See id*.
Opiana heard Griego and Sanchez say "this is a security breach"
while laughing, but Opiana did not see them touch, harass, or
threaten Maniatis. *See id.; see also* ECF No. 111-18,
PageID #s 524-25. According to Opiana, the conversation never
got heated, and Griego and Sanchez did not take out their
weapons during the fifteen or so minutes they were at the house.
*See* ECF No. 117-2, PageID # 723; *see also* ECF No. 111-18,
PageID # 525. They reportedly left the house through the main
front door, which had been left open. *See* ECF No. 117-2,
PageID # 723. According to Opiana, after they left, Maniatis
went to his bedroom, cried for about ten minutes, then called
the police. *See id.; see also* ECF No. 111-18, PageID # 525.

After interviewing Maniatis, Officer Yazaki questioned
Miles, who said he had been working in the computer room in the
house when Maniatis came to the room, told him "I think we have
a problem," and asked him to come outside. *See* ECF No. 117-2,
PageID # 716; *see also* Defendants' Motion, Exhibit Q, ECF No.
111-17, PageID # 522. Miles saw Griego and Sanchez in the
kitchen with handguns at their waists. *See* ECF No. 117-2,

11

PageID #s 716-17; *see also* ECF No. 111-17, PageID #s 522-23.
Miles allegedly told Officer Yazaki that he felt threatened
because he himself was not armed, although neither Griego nor
Sanchez drew any weapon. *See* ECF No. 117-2, PageID # 522.
Miles said that Griego and Sanchez left the house after Maniatis
asked them to leave. *See id.; see also* ECF No. 111-17,
PageID # 523.

After interviewing these witnesses at Maniatis's
house, Officers Yazaki and Nagata returned to the police station
in Kihei, Maui. *See* ECF No. 117-2, PageID # 717; ECF No. 111-5,
PageID # 471; ECF No. 111-19, PageID # 527.  Officer Yazaki
telephoned Matson to ask whether he had called Griego on July
13, 2013, to tell him that he and Sanchez were no longer welcome
at Maniatis's house. *See* ECF No. 111-5, PageID # 471;
Defendants' Motion, Exhibit JJ, ECF No. 111-36, PageID # 589.
According to Officer Yazaki, Matson confirmed that he had called
Griego on that day and had told Griego that he and Sanchez were
no longer welcome and should not return to the house. *See* ECF
No. 111-5, PageID # 471; ECF No. 111-36, PageID # 589.  Matson
allegedly told Officer Yazaki that Griego agreed to stay away.
*See* ECF No. 111-5, PageID # 471; ECF No. 111-36, PageID # 589.

Officers Yazaki and Nagata discussed what they had
learned with Sergeant Won and Officer Miyashiro. *See* ECF

No. 111-5, PageID # 471; ECF No. 111-19, PageID # 527; ECF No. 111-6, PageID # 478. Officer Yazaki believed the officers had probable cause to arrest Griego and Sanchez for Burglary in the First Degree, Terroristic Threatening in the Second Degree, and possible firearm violations. *See* ECF No. 111-5, PageID # 471. Based on the information on hand, Sergeant Won believed the officers had probable cause to arrest Griego and Sanchez for only Burglary in the First Degree under Haw. Rev. Stat. § 708-810. *See* ECF No. 111-6, PageID # 479.

Sergeant Won instructed Officer Yazaki to arrest Griego and Officer Miyashiro to arrest Sanchez for Burglary in the First Degree. *See* ECF No. 111-5, PageID # 471; ECF No. 111-20, PageID # 529-30. Sergeant Won assigned a third officer, Officer Ornellas, to be present for officer safety when the arrests were made because Griego and Sanchez allegedly had weapons. *See id.*; ECF No. 111-44, PageID # 633.

### C. Arrest and Search at Hotel.

Officers Yazaki, Miyashiro, and Ornellas went to Makena Beach and Golf Resort to arrest Griego and Sanchez on the evening of July 14, 2013. *See* ECF No. 111-5, PageID #s 471-72; ECF No. 111-20, PageID #s 529-30; ECF No. 111-44, PageID # 633. A hotel security officer and an assistant hotel manager met the officers in the lobby and took them to Griego's and Sanchez's

13

rooms.  *See* Defendants' Motion Exhibit U, ECF No. 111-21,

PageID # 534; Exhibit V, ECF No. 111-22, PageID # 536.  These

hotel employees watched what happened and were there when the

rooms were searched.  *See* ECF No. 111-21, PageID # 534-35; ECF

No. 111-22, PageID # 536-38.

According to the officers, at around 10:13 p.m.,

Officer Yazaki knocked on Griego's door.  *See* ECF No. 111-5,

PageID # 471-72.  Once Griego came to the door, Officer Yazaki

explained that he was investigating allegations of Burglary in

the First Degree and possible firearms violations.  *See id.*,

PageID # 472.  Officer Yazaki says he read Griego his *Miranda*

rights, and Griego agreed to provide a statement.  *See id*.

Officer Yazaki says he asked Griego if he had any

weapons, and Griego told him that he did.  *See id.*  Officer

Yazaki says that he asked Griego for permission to search for

any guns, and that Griego orally consented, telling Officer

Yazaki he had three handguns in a backpack on the hotel room

floor and allegedly giving Officer Yazaki permission to open the

backpack and to remove any ammunition from the guns.  *See id.*

Three firearms, magazine clips, and a backpack were taken as

evidence.  *See* Defendants' Motion, Exhibit EE, ECF No. 111-31,

PageID # 580.  None of the guns was registered in Hawaii.

Officer Yazaki then arrested Griego for Burglary in the First Degree. *See* ECF No. 111-5, PageID # 472. Officer Yazaki says he handcuffed Griego with his hands in front of his body. *See id.* Officer Yazaki says he did not search anywhere else in the room. *See id.*

Around the same time, at about 10:13 p.m., Officers Miyashiro and Ornellas went to Sanchez's hotel room. *See* ECF No. 111-20, PageID # 530. According to Officer Miyashiro, he told Sanchez that he was under arrest for Burglary in the First Degree. *See id.* The officers say that they asked Sanchez if he had any guns, and Sanchez orally consented to their search for guns. *See* ECF No. 111-44, PageID # 633. According to Officer Ornellas, because Officer Yazaki had already found weapons in Griego's room next door, the officers quickly ended their search in Sanchez's room. *See id.* Officer Miyashiro then arrested Sanchez. *See id.*

Griego and Sanchez have a different recollection of what occurred when the officers arrived at their hotel rooms. Griego says that, when his wife opened the door, one of the police officers asked for "Chief Griego." *See* ECF No. 117-9, PageID # 738. Griego says he showed his police credentials and asked, "Yes, is there something wrong?" *See id*. Griego says he was immediately turned around, handcuffed behind his back, and

arrested. *See id*. He recalls asking what was going on and
being told he was under arrest. *See id*. According to Griego,
an officer asked him if he knew David Maniatis, and he replied,
"I work for him." *See id*. Griego explains that, by this point,
Officer Yazaki and hotel security guards had entered his hotel
room and were searching his bags, even though he had not
consented to entry or a search. *See id*. He says he asked why
they were searching his bags and whether they had a search
warrant. *See id*. Someone allegedly responded, "We don't need a
search warrant." *See id*.

Griego says that, between asking what was going on and
whether the officers had a search warrant, he asked, "Are you
guys real cops?" *See* ECF No. 117-12, PageID # 758. Griego says
he was then "face-planted" into a wall. *See id*. He says the
"face-planting" consisted of being shoved "up against the back
of the room" and "into the wall" while his hands were behind him
and that this "hurt when it happened." *See id*. He recalls
being asked whether he had any guns and responding that his guns
were in a green duffle bag. *See* ECF No. 117-9, PageID # 738.
He says that he did not tell the officers that they could open
and search his bag, but they did so. *See id*.

Griego recalls that one of the officers pulled the
guns out of his bag, and another officer asked him, "How do you

take this out of the holster?" *See id.* Griego says he helped

undo the holster even though his hands were cuffed behind him,

and the officer took the guns and backpack. *See id.* According

to Griego, he repeatedly asked what was going on and was told to

"shut up" or to be quiet. *See id.* He says he asked if he was

being arrested or detained and for what and was told, "You are

under arrest." *See id.*

   According to Sanchez, Officer Miyashiro and several

other men in uniforms arrived at his hotel room. *See* ECF No.

117-10, PageID # 748. They asked if he knew David Maniatis, and

he told them he provided security for him. *See id.* Sanchez

says that the officers asked if Sanchez had any guns on him,

then grabbed his arms and asked him to turn around. *See id.*

Sanchez says he told the officers he had a knife but no guns.

*See id.* Sanchez recalls that the officers also asked for

permission to search his room. *See id.*, PageID # 748. Sanchez

says he asked if he was being detained and if they had a search

warrant and was told, "We don't need one." *See id.* Sanchez

says his room was searched, and nothing was found. *See id.*

According to Sanchez, he waited in the hallway outside his hotel

room while the officers opened drawers and suitcases and went

through his belongings. *See* ECF No. 117-13, PageID # 770.

Sanchez says that, before leaving the hotel, he told the

officers that he had a thirteen-year-old son at the hotel pool. *See* ECF No. 117-10, PageID # 748. The officers allegedly told him not to worry about his son. *See id.*

## D. Processing at Kihei Police Substation.

After arresting Griego and Sanchez at the hotel, Officers Yazaki and Miyashiro took them to the Kihei police substation in separate cars. *See* ECF No. 111-5, PageID # 473; ECF No. 111-20, PageID # 530. Griego says that he had asked the arresting officer to cuff him in the front of his body because he was a disabled veteran with back injuries, but the officer refused to do that. *See* ECF No. 117-9, PageID # 739. Griego alleges that, although he complained that his handcuffs were too tight, the officers did nothing in response. *See id.* Once the car arrived at the police station, Griego allegedly asked Officer Yazaki to let him out of the car so that he could stretch his back. *See id.* Griego says he was suffering back spasms, which worsened while he was waiting in the back seat of the car. *See id.* Officer Yazaki allegedly refused Griego's requests until he "became concerned" about Griego's condition. *See id.* Officer Yazaki disputes that Griego complained about any pain and reports that the car ride "went without incident." *See* ECF No. 111-5, PageID # 473.

Griego says that during the car ride he was mocked by being asked, "So how does it feel to be a police chief in handcuffs?" *See* ECF No. 117-12, PageID # 759. Griego alleges that the mocking continued at the police station. *See id.*

Sanchez says that the arresting officer did not put Sanchez's seatbelt on, so Sanchez slid around on the car's slick, plastic seats during the ride to the police station. *See* ECF No. 117-10, PageID # 749. He recalls telling the officer that he was a "disabled combat wounded vet," asking to be cuffed in front of his body, and telling the officer that his handcuffs were too tight. *Id.* Sanchez says that his requests were ignored and that he was insulted by being told he was "too stupid to be in the military." *See id.* Sanchez says that during the car ride he was further taunted by being asked how many times he had been arrested and by being told that he had "messed with the wrong people." *See id.*

Officer Miyashiro does not recall exactly what was said during the car ride, but he says that he was polite to Sanchez. *See* ECF No. 111-20, PageID # 530. Officer Miyashiro says that Sanchez did not complain about any pain or about his handcuffs being too tight. *See id.* He recalls double-locking Sanchez's handcuffs to prevent the handcuffs from tightening around his wrists. *See id.*

The officers say that Griego and Sanchez were processed in a routine manner. *See* Defendants' Motion, Exhibit A, ECF No. 111-1, PageID #s 451-53. Griego and Sanchez allegedly sat on a bench while being processed. *See id.*, PageID #s 451-52. After processing, Sanchez was put in a cell, but Griego allegedly stayed seated on a bench and was not put in any cell. *See id.*, PageID # 452. The officers and a Public Safety Aide noted in the Inmate Logs that they made regular checks on Griego and Sanchez. *See id.*, PageID #s 451-52.

However, Griego says that he was placed in the same cell as Sanchez for about a minute. *See* ECF No. 117-9, PageID # 739. The cell allegedly had urine, feces, and vomit on the floor. *See id.*; ECF No. 117-10, PageID # 749. Sanchez says he pointed out the cell's conditions to an officer, who then made him leave the cell, take off his shoes and socks, then go back into the cell. *See* ECF No. 117-10, PageID # 749. Sanchez recalls asking for a towel or something to stand on while in the cell and being handed a paper tissue while being told, "Here crybaby stand on this." *See id.* Griego says he saw that Sanchez was standing barefoot in the cell when he was placed in the cell with him. *See* ECF No. 117-9, PageID # 739. The officers deny that the floor of the cell had feces, urine, or

vomit.  *See* ECF No. 111-20, PageID # 533; ECF No. 111-6,
PageID # 481.

Officers Yazaki and Miyashiro say they used Maui
Police Department Form 103 to advise Griego and Sanchez of their
*Miranda* rights at the police station.  *See* ECF No. 111-5,
PageID # 474; ECF No. 111-20, PageID # 532; *see also* Defendants'
Motion, Exhibit KK, ECF No. 111-37, PageID # 590; Exhibit LL,
ECF No. 111-38, PageID # 591.  Griego agreed to make a statement
by signing and dating the form.  *See* ECF No. 111-5,
PageID # 474; ECF No. 111-37, PageID # 590.  Sanchez allegedly
signed and initially declined to waive his rights.  *See* ECF No.
111-20, PageID # 532.  Sanchez says he asked about his son again
but was told not to worry about him and that his refusal to make
a statement to the officers was "only delaying all this."  *See*
ECF No. 117-10, PageID # 749.  About ten minutes later, he
agreed to make a statement and waived his rights.  *See* ECF No.
111-20, PageID # 532.  Officers Yazaki and Miyashiro say that
they treated Griego and Sanchez with respect and that, knowing
that Griego and Sanchez were law enforcement officers, officers
and staff avoided making any derogatory comment to them.  *See*
ECF No. 111-5, PageID # 475; ECF No. 111-20, PageID # 532-33.

Sergeant Won contacted a detective in the Criminal
Investigation Division to inform him of the case and to see

whether bail should be set or whether Griego and Sanchez should be released pending the investigation. *See* ECF No. 111-6, PageID # 481. The detective told Sergeant Won that they should be released pending the investigation. *See id.* Officer Yazaki then walked them out the back door and told Griego and Sanchez how to get to the front of the station. *See id.; see also* Defendants' Motion, Exhibit P, ECF No. 111-16, PageID #s 520-21.

### E. Aftermath of Arrests.

According to Griego, after he and Sanchez were released and picked up by Griego's wife, they changed their flights to leave Maui earlier. *See* ECF No. 117-9, PageID # 740. At about 9 a.m. on the day of their departure, Detective Myrna Sabas-Ryder met them at the airport to verify that they were law enforcement officers. *See id.* Griego said that the detective took photos of their credentials and told them "it was all a big misunderstanding." *See id.* Griego says he asked her if he could get his guns, and she told him that they could not yet be returned to him. *See id.*

Upon returning to New Mexico, Griego retired from the Cuba Police Department in August 2013. *See id.* Griego explains that trespassing charges were filed in Hawaii against him and Sanchez but were eventually dropped. *See id.* However, he says

the process of expunging their records caused him and Sanchez "a lot of problems and lost opportunities." *See id.*

According to Sanchez, he left Maui at the same time as Griego and his family, and the same detective asked to verify his credentials. *See* ECF No. 117-10, PageID #s 749-50. He states that, around October 26, 2013, he lost his training contract with the Army. *See id.* Sanchez also alleges that Maui Police Department employees "stonewalled" him when he later contacted them about the status of his case. *See id.*

**III.    STANDARD OF REVIEW.**

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2010). *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). A movant must support his position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. *See id*. at 323. A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. At least some "'significant probative evidence tending to support the complaint'" must be produced. *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)). *See Addisu*, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). *Accord Addisu*, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

All evidence and inferences must be construed in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc.*, 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.

*Id.* When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *Id.*

## IV.      ANALYSIS.

Defendants move for summary judgment on all claims asserted by Griego and Sanchez. *See* ECF No. 110-1. Griego and Sanchez, however, address in their opposition memorandum only Defendants' arguments relating to the 42 U.S.C. § 1983 claims alleging violations of the Fourth and Fourteenth Amendments. *See* ECF No. 116-2. Defendants therefore contend that Griego and Sanchez have waived other claims. *See* ECF No. 118, PageID # 804-06. Citing Rule 56(e)(2) and (3) of the Federal Rules of Civil Procedure, Defendants argue that they are entitled to summary judgment as to the § 1983 claim asserting violations of the Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments and all state law claims. *See id.*, PageID # 805-06.

On February 6, 2017, this court held a hearing on Defendants' motion for summary judgment. The court asked Plaintiffs' counsel if any of the unrebutted claims were being withdrawn. Plaintiffs' counsel stated that no claims were being

withdrawn but conceded that certain claims had not been addressed in the opposition memorandum.

Rule 56(e) of the Federal Rules of Civil Procedure provides in relevant part,

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> . . . .
>
> (2) consider the fact undisputed for purposes of the motion; [or]
>
> (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it.

Fed. R. Civ. P. 56(e). According to the advisory committee notes accompanying Rule 56, this court is not to grant summary judgment by default even if a party fails to respond to a motion or a party's attempted response fails to comply with Rule 56(c) requirements. *See* Adv. Comm. Notes to the 2010 Amendments to Fed. R. Civ. P. 56(e).

A court may grant summary judgment only if the moving party is entitled to it. *Id.* "If there is a proper response or reply as to some facts, the court cannot grant summary judgment without determining whether those facts can be genuinely disputed." *Id.* Once the court has determined which facts are disputed and undisputed, then it "must determine the legal

consequences of these facts and permissible inferences from them." *Id.*

Plaintiffs' opposition papers clearly do not comply with Rule 56(c) or with Local Rule 56.1. They do not cite to particular parts of materials in the record to properly address all Defendants' assertions. *See* Fed. R. Civ. P. Rule 56(c)(1); Local Rule 56.1(b), (c). Nor do they address whether Defendants establish the absence of a genuine factual dispute. *See* Fed. R. Civ. P. Rule 56(c)(2); Local Rule 56.1(b). Nevertheless, this court considers each claim at issue on summary judgment.

### A. Summary Judgment Is Granted to Defendant County of Maui With Respect to § 1983 Claims, and Granted in Part and Denied in Part With Respect to § 1983 Claims Against Individual Defendants.

#### 1. There Is No Evidence Supporting a § 1983 Claim Against the County of Maui.

This court gave counsel for Griego and Sanchez an opportunity at the hearing on the present motion to point out where in the record this court might discern a basis for their § 1983 claim against the County of Maui, given the requirements for municipal liability set forth in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Counsel pointed to nothing in the record. Noting that there are neither facts nor arguments before the court supporting any

§ 1983 claim against the County, this court grants summary judgment to the County on all § 1983 claims asserted against it.

**2.  Summary Judgment Is Granted to the Individual Defendants as to the § 1983 Claim Based on an Alleged Fifth Amendment Violation.**

Counsel for Griego and Sanchez also conceded that they did not have grounds for a separate § 1983 claim based on a violation of the Fifth Amendment.  Even if counsel had not conceded this, summary judgment would be proper because there is nothing in the record going to any Fifth Amendment violation. *See Chavez v. Martinez*, 538 U.S. 760, 770 (2003) (questioning how defendant could allege Fifth Amendment violation when he "was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case," which requires at least "initiation of legal proceedings").  To the extent any individual Defendant seeks summary judgment on any § 1983 claim based on an alleged Fifth Amendment violation, this court grants that portion of the motion.

**3.  Summary Judgment Is Granted to Individual Defendants With Respect to Any § 1983 Claim Based on an Alleged Eighth Amendment Violation.**

Counsel for Griego and Sanchez said at the hearing on the present motion that no specific argument had been presented in the opposition papers relating to an Eighth Amendment

violation, but that the facts underlying any Eighth Amendment claims were set forth.  This court is not persuaded that Griego and Sanchez may proceed with their Eighth Amendment claim.

The Eighth Amendment's prohibition on cruel and unusual punishment prevents government officials from acting with deliberate indifference to a prisoner's health and safety. *See Hope v. Pelzer*, 536 U.S. 730, 737-38 (2002).  Every United States Supreme Court decision considering whether a punishment was "cruel and unusual" has dealt with punishment in the context of an actual criminal case with an actual judgment.  *Ingraham v. Wright*, 430 U.S. 651, 666 (1977); *see, e.g.*, *Estelle v. Gamble*, 429 U.S. 97 (1976) (incarceration without medical care); *Gregg v. Georgia*, 428 U.S. 153 (1976) (execution for murder); *Robinson v. California*, 370 U.S. 660 (1962) (incarceration for addiction to narcotics).  The Court recognized that its decisions have limited the kinds of punishment that may be imposed on those convicted of crimes, barring punishment grossly disproportionate to the severity of a crime and setting substantive limits on what can be made criminal and punished as such.  *See Ingraham*, 430 U.S. at 667.  In the few cases in which the Court has considered claims that certain impositions outside the criminal process constituted "cruel and unusual" punishment, the Court

has concluded that the Eighth Amendment is inapplicable. *See id.* at 668.

Griego and Sanchez were not convicted of any crime. They were not incarcerated to serve any sentence. Because the Eighth Amendment does not apply to those who are not incarcerated pursuant to criminal judgments, this court grants summary judgment to the individual Defendants on any § 1983 claim based on an alleged Eighth Amendment violation.

> **4. Summary Judgment Is Granted to the Individual Defendants With Respect to the § 1983 Claim Based on an Alleged Ninth Amendment Violation.**

Griego and Sanchez assert a § 1983 claim based on an alleged violation of the Ninth Amendment. The Ninth Amendment provides, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. The Ninth Circuit has observed that the Ninth Amendment "has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim." *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986). Other circuits agree that the Ninth Amendment cannot serve as an independent source of rights for a § 1983 claim. *See Froehlich v. Wis. Dep't of Corrs.*, 196 F.3d 800, 801 (7th Cir. 1999); *Vega-Rodriguez v. P.R. Tel. Co.*, 110 F.3d 174, 182 (1st Cir.

31

1997); *Gibson v. Matthews*, 926 F.2d 532, 537 (6th Cir. 1991). The Ninth Amendment provides a "rule of construction," *see Jenkins v. C.I.R.*, 483 F.3d 90, 92 (2d Cir. 2007), or a "rule of interpretation," *see Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013).

Because the Ninth Amendment does not guarantee any specific constitutional right, as required for pursuing a constitutional claim under § 1983, Griego and Sanchez may not proceed against the individual Defendants under § 1983 based on the Ninth Amendment.

**5.    Summary Judgment Is Granted in Individual Defendants' Favor With Respect to § 1983 Claims Alleging Fourth Amendment Violations Based on the Fact of Plaintiffs' Arrests.**

Having addressed above the § 1983 claims based on alleged violations of the Fifth, Eighth, and Ninth Amendments, this court turns to the crux of what Griego and Sanchez assert under § 1983. They expressly opposed the present motion with respect to alleged Fourth Amendment violations. This court addresses the Fourth Amendment issue relating to the fact of arrest before turning to any Fourth Amendment claims relating to the manner of the arrests.

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated, and no Warrants shall issue, but upon
probable cause, supported by Oath or affirmation,
and particularly describing the place to be
searched, and the persons or things to be seized.

U.S. Const. amend IV.

Defendants assert that the individual officers have
qualified immunity with respect to all claims under § 1983.
Defendants contend that "Plaintiffs are unable to establish a
constitutional violation since plaintiffs' allegations, if true,
do not establish a constitutional violation."  ECF No. 110-1,
PageID # 428.

"[G]overnment officials performing discretionary
functions [are entitled to] qualified immunity, shielding them
from civil damages liability as long as their actions could
reasonably have been thought consistent with the rights they are
alleged to have violated."  *Anderson v. Creighton*, 83 U.S. 635,
638 (1987) (citations omitted); *see also Richardson v. McKnight*,
521 U.S. 399, 407-08 (1997).

The Supreme Court has set forth a two-pronged analysis
for determining whether qualified immunity applies.  *See Saucier
v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other
grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  On one
prong, the court considers whether the facts, "[t]aken in the
light most favorable to the party asserting the injury[,] . . .
show [that] the [defendant's] conduct violated a constitutional

33

right[.]" *Saucier*, 533 U.S. at 201.  Under this prong, this court must decide whether the facts Griego and Sanchez allege as the basis for their § 1983 claim make out a violation of a constitutional right.  *Pearson*, 129 S. Ct. at 815-16.

Under the other prong, the court examines whether the right allegedly violated was clearly established at the time of the violation.  *Saucier*, 533 U.S. at 201; *Scott v. Harris*, 550 U.S. 372, 377 (2007).  The "clearly establishes" prong requires a determination of whether the right in question was "clearly established . . . in light of the specific context of the case, not as a broad general proposition."  *Id.*; *Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004).  Defendants bear the burden of establishing that they reasonably believed the alleged conduct was lawful.  *See Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Trevino v. Gates*, 99 F.3d 911, 916-17 (9th Cir. 1996).

The crucial question is whether Defendants could have reasonably (even if erroneously) believed that their conduct did not violate Griego's and Sanchez's rights.  *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001).

The Ninth Circuit has reconstituted *Saucier*'s two prongs into three:

> Determining whether an official is entitled to
> summary judgment based on the affirmative defense
> of qualified immunity requires applying a three-
> part test.  First, the court must ask whether

>"taken in the light most favorable to the party
>asserting the injury, the facts alleged show the
>officer's conduct violated a constitutional
>right?"  If the answer is no, the officer is
>entitled to qualified immunity.  If the answer is
>yes, the court must proceed to the next question:
>whether the right was clearly established at the
>time the officer acted.  That is, "whether it
>would be clear to a reasonable officer that his
>conduct was unlawful in the situation he
>confronted."  If the answer is no, the officer is
>entitled to qualified immunity.  If the answer is
>yes, the court must answer the final question:
>whether the officer could have believed,
>"reasonably but mistakenly . . . that his or her
>conduct did not violate a clearly established
>constitutional right."  If the answer is yes, the
>officer is entitled to qualified immunity.  If
>the answer is no, he is not.

*Skoog v. Cty. of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006)

(footnotes and brackets omitted).

Whether an act is a violation of a federal right and
whether the right was clearly established at the time of the
violation are pure legal questions for the court.  *See Martinez
v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003).  Freedom from
unreasonable seizures is clearly an established right guaranteed
by the Fourth Amendment.  No police officer could have
reasonably believed that an arrest without a warrant and not
based on probable cause was permissible.

Viewed in the light most favorable to Griego and
Sanchez, the facts before this court leave no question of fact
that the officers had probable cause to arrest Griego and

35

Sanchez. The existence of probable cause means that Griego and Sanchez cannot prove a violation of the Fourth Amendment based on the fact of their arrests and that the officers are entitled to qualified immunity as to the portion of the § 1983 claim based on an alleged Fourth Amendment violation in the form of the fact of arrest.

The Ninth Circuit has noted that a court's "task in determining whether probable cause to arrest existed as a matter of law in [a] § 1983 action is slightly different from a similar determination in the context of a direct review of a criminal arrest." *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir. 1984). In reviewing a criminal arrest, the court must review "both law and fact" and must "draw the line as to what is and is not reasonable behavior." *Id.* at 1007-08. In a § 1983 action, "the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury." *Id.; see also Smiddy v. Varney*, 665 F.2d 261, 265 (9th Cir. 1981). "[S]ummary judgment is appropriate only if no reasonable jury could find that the officers did or did not have probable cause to arrest." *McKenzie*, 738 F.2d at 1008. This court concludes that, in the present case, the undisputed facts establish that no reasonable jury could find the officers lacked probable cause to arrest Griego and Sanchez.

36

In guaranteeing the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," the Fourth Amendment does not forbid all searches and seizures, only unreasonable ones. *See Terry v. Ohio*, 392 U.S. 1, 9 (1968).

An officer may arrest a person for a felony, or for a misdemeanor committed in the officer's presence, if probable cause supports the arrest. *United States v. Watson*, 423 U.S. 411, 424 (1976); *see also Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001) (stating that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender"). Whether officers have probable cause to arrest an individual turns on "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable [people], acting on facts leading sensibly to their conclusions

37

of probability." *Stoot v. City of Everett*, 582 F.3d 910, 918-20 (9th Cir. 2009) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

Determining whether there was probable cause turns on the information the officers had at the time of the arrests. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Thus, the Ninth Circuit has noted that "[i]t is essential to avoid hindsight analysis, *i.e.*, to consider additional facts that became known only after the arrest was made." *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008).

Conclusive evidence of guilt is not necessary to establish probable cause, but "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." *McKenzie*, 738 F.2d at 1008. In determining whether an officer had probable cause to arrest an individual, a court must examine the events leading up to the arrest and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. *Maryland v. Pringle*, 540 U.S. 366, 372 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Probable cause is thus an objective standard, and an officer's subjective intention in deciding whether to arrest is immaterial to whether the

officer's actions were reasonable for Fourth Amendment purposes. *John*, 15 F.3d at 940.

The Ninth Circuit has issued several decisions in which police officers were not present when alleged crimes were committed and relied on accounts by others in deciding whether to make an arrest. In *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 917 (9th Cir. 2001), the plaintiff alleged that she was arrested based on a bus driver's false criminal report for battery. *Id.* at 918. The bus driver allegedly told police that the plaintiff had "touched him," without elaborating. *Id.* The plaintiff alleged that the arresting officer refused to identify himself, would not tell her why she was being arrested, and did not allow her to give her side of the story before arresting her. Relying on *Fuller v. M.G. Jewelry*, 950 F.2d 1437 (9th Cir. 1991), the court observed, "In establishing probable cause, officers may not solely rely on the claim of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses." *Id.* at 925 (citing *Fuller*, 950 F.2d at 1444). The Ninth Circuit concluded that the facts surrounding the arrest raised an inference that the officers had arrested the plaintiff based on the bus driver's "unexamined charge." *Id.* The court noted that

if the officers had not "independently investigate[d]" the bus driver's claim of battery, then they lacked probable cause to arrest the plaintiff. *See id.* (noting, however, that evidence outside complaint indicated officers had interviewed additional witnesses, although consideration of this information was not appropriate on motion to dismiss).

In *Fuller*, the plaintiffs were arrested for having stolen a ring from a jewelry store after an employee at the store reported that they had stolen the ring. 950 F.2d at 1349, 1443. The employee told police that the plaintiffs had handled the missing ring before leaving the store and that no one else in the store had the ring. *Id.* The officers also learned from a woman in the restroom that one of the plaintiffs had run into the women's bathroom and asked everyone to leave as she appeared to try to make herself throw up. *Id.* The Ninth Circuit noted that the "police officers had a duty to conduct an investigation into the basis of the witness' report," but determined that the officers had conducted a sufficient investigation by relying on the employee's testimony and by questioning (1) a second store employee, who confirmed that the plaintiffs were the last people with the ring, (2) a witness who allegedly saw one of the plaintiffs attempting to throw up in the restroom, and (3) the plaintiffs and their companion. *Id.* at 1444. The Ninth Circuit

declined to determine whether there was probable cause but, in assessing whether the officers were entitled to qualified immunity, concluded that the officers "could have reasonably believed that there was probable cause to arrest" the plaintiffs. *Id.*

The officers in *Fuller* relied on more detailed statements by witnesses than the officer in *Arpin*. *Id.* The court in *Fuller* declined to adopt the argument that "merely because citizen witnesses are presumptively reliable, the officers in this situation had no duty to examine further the basis of the witness' knowledge or talk with any other witnesses." *Id.* What the court decided was that "the general proposition that private citizen witnesses or crime victims are presumed reliable does not 'dispense with the requirement that the informant . . . furnish underlying facts sufficiently detailed to cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator.'" *Id.* (quoting *People v. Ramey*, 16 Cal.3d 263, 127 Cal.Rptr. 629, 545 P.2d 1333, 13336 (1976)).

In *Peng v. Penghu*, 335 F.3d 970 (9th Cir. 2003), the Ninth Circuit clarified when statements by a victim may support probable cause. *Id.* at 978 ("A sufficient basis of knowledge is established if the victim provides 'facts sufficiently detailed

to cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator.'"). The victim in *Peng* told the officer that her brother had approached her and asked for certain documents, and that when she refused to give him the documents, he "reached out and grabbed the documents from [her] right hand and refused to let go, engaging in a tug of war with [her] over the documents." *Id.* at 973. According to the victim, her brother then "raised his right fist as though he was going to strike [her] in the face." *Id.* "[F]earing for her safety, [she] released the documents," and her brother then reportedly took the documents, left, then came back twenty minutes later and refused to return the documents. *Id.* The officer arrested the victim's brother for robbery after interviewing the victim and two other family members who, through an interpreter, told the officer that they had seen the victim's brother grab the documents from the victim against her will. *Id.* at 974.

In addressing the argument that the officer did not have probable cause to arrest because he relied solely on the victim's allegations, the court concluded that the officers' reliance solely on the victim's statements was sufficient because the witness "provided sufficiently detailed facts regarding the incident to support a finding that probable cause

to arrest existed." *Id.* at 978.  The court, however,

acknowledged that the officer had also interviewed two witnesses

with the help of an interpreter.  *Id.*  The court went on to say

that it was satisfied the officer made a "reasonable

investigation under the circumstances" before the arrest and

concluded that "the presence of a factual dispute regarding a

victim's complaint at the scene of an alleged domestic

disturbance does not defeat probable cause if:  1) the victim's

statements are sufficiently definite to establish that a crime

has been committed; and 2) the victim's complaint is

corroborated by either the surrounding circumstances or other

witnesses." *Id.* at 979.

Other circuits have concluded that an officer's

reliance solely on a victim's statement may be sufficient to

support a finding of probable cause.  The Seventh Circuit has

stated, "Nothing suggests that a victim's report must be

unfailingly consistent to provide probable cause." *Spiegel v.*

*Cortese*, 196 F.3d 717, 725 (7th Cir. 1999).  The Sixth Circuit

has similarly held, "An eyewitness identification will

constitute sufficient probable cause unless, at the time of the

arrest, there is an apparent reason for the officer to believe

that the eyewitness was lying, did not accurately describe what

he had seen, or was in some fashion mistaken regarding his

recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). The Second Circuit echoed these approaches, noting that information from a victim is sufficient to establish probable cause even when the suspect and victim provide different version of events, "unless the circumstances raise doubt as to the person's veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

The Ninth Circuit has found that, when allegations are not sufficiently reliable (as in a case involving a four-year-old's allegation of abuse), officers lack probable cause to arrest an alleged perpetrator. *See Stoot*, 582 F.3d at 919; *see also John*, 515 F.3d at 940 (concluding officer had probable cause to arrest after thoroughly probing ten-year-old's allegations of abuse).

To arrest Griego and Sanchez for Burglary in the First Degree, the officers had to have probable cause to believe that Griego and Sanchez had "intentionally enter[ed] or remain[ed] unlawfully" in Maniatis's house, with the "intent to commit therein a crime against" a person or against Maniatis's property rights. *See* Haw. Rev. Stat. § 708-810(1). Additionally, the officers had to have probable cause to believe that Griego and Sanchez were either "armed with a dangerous instrument in the course of committing the offense," had "intentionally,

44

knowingly, or recklessly inflict[ed] or attempt[ed] to inflict
bodily injury on anyone in the course of committing the
offense," or had "recklessly disregard[ed] a risk that
[Maniatis's house]" was a "dwelling." *See id.* § 708-810(1)(a)-
(c).

The officers contend that Griego and Sanchez were
arrested based on probable cause. *See* ECF No. 110-1,
PageID # 414. The officers point to what they were told by
Maniatis and his employees. *See id.*, PageID # 415-16.

Griego and Sanchez counter that the officers'
investigation lacked "any reasonably trustworthy information
that Plaintiffs intended to commit or committed crimes against
Maniatis or his property." *See* ECF No. 116-2, PageID # 688.
Griego and Sanchez point to inconsistencies in the witness
statements and the absence of any evidence of injury to Maniatis
or loss of property. *See id.*, PageID #s 688-90. Specifically,
they note that Maniatis described feeling "scared" and
"threatened" but reported that neither Griego nor Sanchez drew a
weapon. *Id.*, PageID # 688. They note that Maniatis reportedly
asked Griego and Sanchez to leave his home, and Griego and
Sanchez "did so--without any apparent fuss--" through the front
door. *Id.* They say that what Maniatis's employees told the

officers "highlighted big gaps" in Maniatis's account that he was either physically threatened or felt threatened. *Id.*

For instance, Opiana saw Griego and Sanchez patting Maniatis on the back but did not report seeing them grab his wrists and place them behind his back. *Id.*, PageID # 688-89. Opiana also said that the conversation was not heated and that he did not see Griego or Sanchez harass or threaten Maniatis. *Id.*, PageID # 689. Both Opiana and Miles reported to the officers that neither Griego nor Sanchez drew any weapon. *Id.* Griego and Sanchez say the officers "completely disregarded [this] specific and conflicting testimony of Maniatis and his employees that should have warranted, at the very least, measured attempts to interview Plaintiffs," which Griego and Sanchez maintain would have led the officers to find no basis for arresting them. *See id.*, PageID # 690.

Griego and Sanchez treat each individual statement made to the officers in this case as an "unexamined charge" that required further investigation. However, in contrast to *Arpin*, which dealt with an unelaborated accusation of a crime, this case is closer to *Fuller* and *Peng*, in which witnesses provided sufficiently detailed facts regarding the incident. The officers were told by Maniatis that he had a dispute with Griego and Sanchez and had asked them to take their belongings and

46

leave.  Maniatis said he had instructed Matson to call Griego to tell him that he and Sanchez were no longer welcome and should not return.  Maniatis said he had also told other employees that Griego and Sanchez were not allowed at his house.  He described to the officers how Griego and Sanched had snuck onto his property, talked to him in the kitchen with their guns visible at their waists, grabbed and held his wrists behind his back, and orally threatened him by saying "this is a security breach" and "we can get you at anytime."  Maniatis said he went to another room to look for his security guards and then asked Griego and Sanchez to leave, which they did.

Nothing in the record suggests that the officers had reason to disbelieve Maniatis's detailed statements about the incident.  Griego and Sanchez say Maniatis was emotionally unstable and erratic, and this court recognizes that there may well be a dispute about the accuracy of Maniatis's account.  But this court is not concerned with whether Maniatis's account was correct.  Instead, in examining the record to see whether there was probable cause to arrest Griego and Sanchez, this court examines whether, among other things, Officer Yazaki had any reason to think Maniatis "was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation."  *See Ahlers*, 188 F.3d at 370

(6th Cir. 1999).  This court finds no evidence suggesting that the circumstances of the reported incident and subsequent interviews with eyewitnesses should have raised doubts as to Maniatis's truthfulness.  *See Curley*, 268 F.3d at 70.

The purported inconsistencies are not actual contradictions.  What Griego and Sanchez identify as discrepancies could be explained by the absence of employees from the scene of some of what Maniatis recounted, and with Maniatis's depiction of himself as apparently "going along" with Griego and Sanchez to diffuse the situation.

Notably, even though Maniatis reportedly provided a detailed account, the officers did not rely solely on him.  The officers interviewed two of Maniatis's employees at the house, both of whom confirmed that Griego and Sanchez had been at the house without permission, had guns visible at their waists, and had been heard laughing and saying "this is a security breach." Contrary to Griego's and Sanchez's position that this information reveals inconsistencies between the accounts of Maniatis and his employees, these specific facts were consistent with what Maniatis told the officers.  Both eyewitnesses also described Maniatis as appearing "scared" and "freaked out." When Officer Yazaki telephoned Matson to verify Maniatis's

statements, Matson confirmed that he had called Griego to tell him to stay away and that Griego had agreed.

Griego and Sanchez argue that the officers should have interviewed them before arresting them. While that could well have given the officers more information and may often make sense, this court is unaware of any requirement that a suspect be interviewed before being arrested. In the first place, such a requirement would make it impossible to arrest a suspect who exercised his Fifth Amendment right to be silent. In the second place, even if Griego and Sanchez had not invoked that right, their statements would not necessarily have precluded their arrests. Their statements may have contradicted Maniatis's statement, but differing accounts do not automatically preclude arrests.

Three days before the hearing on the present motion, counsel for Griego and Sanchez sent a letter to the court with a copy of *Arekat v. Donohue*, Civ. No. 06-16074, 2010 WL 4683906, 404 F. App'x 160 (9th Cir. 2010) (unpublished). (Local Rule 7.8(e) required such a letter to have been submitted at least four days before the hearing, with the relevant portions of any attached case highlighted.) Counsel took the position that the facts and issues in *Arekat* were identical to those in this case. This court disagrees.

*Arekat* involved an appeal from the denial of a renewed motion for judgment as a matter of law on an underlying § 1983 claim.  404 F. App'x at 161.  In that case, police officers took Arekat into custody "without a warrant and without any other judicial process" for a psychiatric examination, pursuant to Haw. Rev. Stat. § 334-59, which allows police to transport an individual to a medical facility for an examination in an emergency if the individual "is *imminently* dangerous to self or others, or is gravely disabled, or is obviously ill."  *Id.*

At trial, the jury found that the officers had had probable cause to seize Arekat.  *Id.*  The Ninth Circuit reversed on the ground that the evidence at trial "was insufficient as a matter of law to permit any reasonable juror to reach that determination."  *Id.*  The Ninth Circuit concluded that there was no evidence in the record to support a finding that Arekat was "gravely disabled," "obviously ill," or a danger to himself or others.  *Id.* at 162.  The Ninth Circuit noted that much of the evidence cited by the officers as supporting probable cause consisted of statements and observations occurring after Arekat was seized or long before that.  *Id.*  The remaining information came from "a disgruntled and recently discharged former employee of Arekat."  *Id.* at 163.  The Ninth Circuit stated, "For purposes of establishing probable cause, an arresting officer is

permitted to depend on information supplied by a 'reliable'
source.'" *Id.* The court concluded that the former employee was
not a reliable source because "[h]e had no history of providing
reliable information to the police, and all that defendants knew
of him was that he had several recent criminal convictions, that
he was a long time drug addict, and that he was engaged in a
wage dispute with Arekat." *Id.*

Even if the former employee's information had been
reliable, "it could not constitute evidence of probable cause"
because the statute required probable cause that Arekat was an
"imminent" danger to himself or others, and the information
provided did not speak to anything "imminent." *Id.* Therefore,
"the only finding or conclusion that was permissible on the
record before the jury is that defendants did not have probable
cause to seize Arekat under the *emergency* mental health
statute." *Id.* at 164.

*Arekat* is not persuasive here. Contrary to what
Griego and Sanchez contend, *Arekat* does not stand for the
proposition that an individual providing information to police
officers must have a history of providing reliable information
to the police to be deemed a reliable source. Rather, the Ninth
Circuit deemed unreliable a person known to officers as having
recent criminal convictions, being a drug addict, and having a

motive to lie.  The present case involves no analogous circumstances.

Here, the officers had a detailed statement by the alleged victim, as well as statements by employees that corroborated many of the details.  Similar to the officer in *Peng*, the officers conducted a reasonable investigation before concluding they had probable cause to arrest.  The officers are therefore entitled to qualified immunity.

This court does not "minimize the serious effect this unfortunate incident must have had upon" Griego and Sanchez. *See John*, 515 F.3d at 942.  The court recognizes that, particularly for a law enforcement officer, being escorted from a hotel in handcuffs and then booked at a police station must have been extremely upsetting and may have had professional and personal consequences.  *See id.*  But the law of qualified immunity controls.  Given the existence of probable cause, Defendants are entitled to summary judgment with respect to the § 1983 claims relating to the fact of Griego's and Sanchez's arrests.

> **6.    Summary Judgment Is Denied With Respect to § 1983 Claims Alleging a Fourth Amendment Violation Based on the Manner of the Arrests.**

Although this court concludes that the officers had probable cause to arrest Griego and Sanchez, the Fourth

Amendment inquiry does not end there. Griego and Sanchez, while not alleging serious permanent physical injury, do challenge the manner of their arrests. Such a challenge falls within the Fourth Amendment. *See Fontana v. Haskin*, 262 F.3d 871, 878 (9th Cir. 2001) ("The Fourth Amendment's requirement that a seizure be reasonable prohibits more than the unnecessary strike of a nightstick, sting of a bullet, and thud of a boot.").

While not as clearly addressed in the parties' papers as would have been helpful, a § 1983 claim alleging a Fourth Amendment violation based on the manner of the arrests appears to be in issue on the present motion. *See Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985) ("[O]nce a seizure has occurred, it continues throughout the time the arrestee is in the custody of the arresting officers . . . Therefore, excessive use of force by a law enforcement officer in the course of transporting an arrestee give rise to a section 1983 claim based upon a violation of the Fourth Amendment."). *See also Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (holding the reasonableness analysis under the Fourth Amendment "depends on not only when a seizure is made, but also how it is carried out").

In traditional excessive force cases, courts analyze alleged violations of the Fourth Amendment under the framework

established by the Supreme Court in *Graham v. Connor*,
490 U.S. 386 (1989). The authority to arrest "necessarily
carries with it the right to use some degree of physical
coercion or threat thereof to effect it." *Id.* at 396. Police
officers "are not required to use the least intrusive degree of
force possible," but must act within a reasonable range of
conduct. *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th
Cir. 2012) (quotation marks omitted). The existence of an
injury does not necessarily mean that a plaintiff's
constitutional rights have been violated or that police officers
used excessive force in arresting the plaintiff. Instead, for
Fourth Amendment purposes, "The question is whether the
officers' actions are 'objectively reasonable' in light of the
facts and circumstances confronting them." *Graham*, 490 U.S. at
397.

Under *Graham*, the reasonableness of a particular use
of force "must be judged from the perspective of a reasonable
officer on the scene, rather than with the 20/20 vision of
hindsight." *Id.* at 396. In other words, not every push or
shove, even if it may later seem unnecessary in the peace of a
judge's chambers, violates the Fourth Amendment. The calculus
of reasonableness must allow for the fact that, in circumstances
that are tense, uncertain, and rapidly evolving, police officers

are often forced to make split-second judgments about the amount of force needed in a particular situation. *Id.* However, "[g]ratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment." *Fontana*, 262 F.3d at 880. Whether an officer's actions were "objectively reasonable" should be determined without regard to the officer's underlying intent or motivation. *Graham*, 490 U.S. at 397.

In the Ninth Circuit, the objective reasonableness inquiry under *Graham* involves a three-step analysis: First, the court must assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force used. *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003). Second, the court must assess the importance of the governmental interests at stake by considering the *Graham* factors: (a) the severity of the crime, (b) whether the suspect posed an immediate threat to the safety of the officer and others, and (c) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* Third, the court must balance "the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Id.* "Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences

therefrom . . . summary judgment or judgment as a matter of law
. . . should be granted sparingly" in cases involving claims of
excessive force. *Drummond v. City of Anaheim*, 343 F.3d 1052,
1056 (9th Cir. 2003).

In this case, the officers believed that Griego and
Sanchez had just committed a burglary and were armed with guns.
The officers allegedly handcuffed Griego and Sanchez while they
searched for guns. The detention and search apparently occurred
quickly and contemporaneously. Griego and Sanchez say the
officers knew they were law enforcement officers. The officers
indisputably knew that Griego and Sanchez had provided security
for Maniatis at his home. Nothing in the record suggests that
Griego or Sanchez resisted their arrests or attempted to evade
arrest by fleeing.

Griego says that, after he was handcuffed, he was hurt
by being "face-planted" against a wall in the back of the room.
Both Griego and Sanchez say their hands were cuffed behind them.
They say they asked the officers to place their handcuffs in
front because they were disabled veterans with back injuries.
They also allege that their handcuffs were too tight and that
the officers ignored their requests to loosen their handcuffs.
Sanchez says that the arresting officer did not place a seatbelt
on him for the car ride to the station. Both Griego and Sanchez

claim that they were repeatedly mocked by the officers and placed in dirty cells with feces, urine, or vomit.

The officers dispute these allegations. They say they did not use more force than needed in placing handcuffs on Griego and Sanchez in the front of their bodies. The officers say that they cuffed Griego and Sanchez in a manner that prevented the handcuffs from tightening, placed seatbelts on both men for the car rides, and treated both men in a routine manner while they were processed. The officers say that the cells were not dirty and that Griego was not placed in any cell.

This court's role in deciding a motion for summary judgment is not to weigh the credibility of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (at the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"); *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc) (the "court does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial").

Genuine questions of fact exist as to whether the manner of the arrests was objectively reasonable under the circumstances. The accounts of Griego and Sanchez, if accepted

by a jury, may be sufficient for the jury to conclude that the amount of force or some other circumstance relating to their arrests constituted an unreasonable seizure. Conversely, the evidence may end up supporting a finding that the manner of the arrests was reasonable. This court leaves this determination to the jury and here denies summary judgment with respect to the § 1983 claim alleging a Fourth Amendment violation based on the manner of arrest.

**7. Summary Judgment Is Denied With Respect to § 1983 Claims Alleging Fourth Amendment Violations Based on the Gun Searches.**

Having addressed the § 1983 claim alleging a Fourth Amendment violation based on Griego's and Sanchez's arrests, this court turns to the alleged Fourth Amendment violations relating to searches.

Defendants contend that the officers' search for weapons did not violate the Fourth Amendment because Griego and Sanchez consented to the searches of their hotel rooms and belongings for weapons. *See* ECF No. 110-1, PageID #s 418–21. Griego and Sanchez deny that they consented to any search and say there are genuine issues of material fact in what they call "two wildly divergent versions of the events that occurred," constituting "the very types of factual disputes that hinge on

witness credibility determinations that can only be made by the triers of fact." *See* ECF No. 116-2, PageID # 692.

A search that is "conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). A search conducted pursuant to consent is a specifically established exception to the warrant and probable cause requirements and therefore not violative of the Constitution. *Id.*

Although the officers say that Griego and Sanchez orally consented to a search for weapons, Griego and Sanchez say the officers entered their hotel rooms, searched their belongings without permission, and told them search warrants were not needed. Griego does not dispute that he told the officers he had guns in a bag, but he says he did not tell the officers they could open and search his bag. Sanchez similarly does not dispute that he told the officers that he had a knife but no guns on him. Sanchez is not challenging the officers' recovery of the knife, but he says the officers searched his room for other weapons without permission, going through his drawers and suitcases, without finding anything. These

differing accounts, viewed in the light most favorable to Griego and Sanchez, leave this court with genuine issues of material fact as to whether Griego and Sanchez consented to the search for guns.

The record contains no evidence suggesting that the officers had a search warrant. Officer Yazaki suggests in his declaration that, even if Griego had not allegedly consented to a search of his bag, exigent circumstances would have justified the search. Officer Yazaki says:

> If Griego had not given me consent to open the backpack, I was obligated under General Order 101.3 and my training, to secure Griego's firearms. It would be a danger to myself and anyone near the backpack for me to transport loaded firearms in a backpack. Any one of the three firearms could have accidentally discharged during transport, seriously injuring or killing someone. I believed that, based on that danger, exigent circumstances existed for the backpack to be opened and the firearms secured in the absence of Griego's consent. It would have been unsafe to transport firearms without clearing them of ammunition and locking them in an open position.

ECF No. 111-5, PageID #s 472-73.

This court is not persuaded that exigent circumstances justified a warrantless search of Griego's bag. The officers could easily have given the bag to hotel employees, who were present at the time. Hotel employees could have held the bag in a secure location while officers sought a warrant. The record does not indicate that the officers would have seen any danger

in hand-carrying the bag to a secure location in the hotel or that the guns needed to be at the station immediately. It may indeed be the case that moving the bag within the hotel would have been dangerous, but that is not established in the record. In fact, although Griego said he would remove ammunition from guns he himself seized, he said it was his practice to have a magazine in one of his own firearms (although not in the gun's chamber) while traveling, suggesting that he did not necessarily see having a loaded gun as being a problem during transport. *See* ECF 117-12, PageID # 758. Moreover, Griego and Sanchez complain that the guns were held at the station for some time after they were released and asked for their return, and there is no evidence that the guns were tested or used in any proceeding during that time. Therefore, even if the court were to accept Officer Yazaki's assertion that it would have been dangerous to move the bag in a car without first opening the bag and unloading the guns that Griego said were in the bag, the present record does not establish that there was such an immediate need for the guns to be at the station that they could not have been secured at the hotel pending the issuance of a warrant.

In light of the disputed material facts, a jury must determine whether Griego and Sanchez consented to searches for

items other than the knife on Sanchez's person.  Accordingly, this court denies summary judgment as to the § 1983 claim alleging an unreasonable search.

Although denying summary judgment with respect to the gun searches and to the manner of arrest, this court has clearly in mind the principle that qualified immunity is designed to protect the right of a public official not to have to proceed to trial.  What is preventing this court from ruling that the individual Defendants have qualified immunity with respect to the gun searches and the manner of arrest is the presence of factual disputes going to what the individual Defendants did.  Qualified immunity is a matter purely of law, but the law has to be applied to facts.  Here, certain facts are in dispute.  The officers say they searched pursuant to consent, while Griego and Sanchez say they never gave consent.  This court cannot grant summary judgment on qualified immunity grounds because, given the uncertainty about what the officers did, the court cannot possibly say whether the acts the officers took did or did not violate a constitutional right.

Summary judgment motions raising qualified immunity must be denied when material facts affecting immunity are in dispute.  It is to allow trial on disputed facts that the Ninth Circuit declines to review on interlocutory appeal such a

denial.  *See Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) ("Our jurisdiction to review an interlocutory appeal of a denial of qualified immunity . . . is limited exclusively to questions of law.").  *See generally Rodriguez v. Lockheed Martin Corp.,* 627 F.3d 1259, 1264-66 (9th Cir. 2010) (discussing factual questions in context of government contractor's claim of immunity).

> **B.    Summary Judgment Is Granted in Part and Denied in Part With Respect to the State Law Claims.**

> **1.    There Is No Evidence Supporting Any Negligent Training/Supervision/Discipline Claims Against the County.**

Because there are neither facts nor arguments before the court supporting any negligent training, supervision, or discipline claim against the County, this court grants summary judgment to the County on such claims.  Such negligence is only alleged, unsupported by any admissible evidence on that score.

> **2.    Summary Judgment Is Granted to All Defendants With Respect to Claims for False Arrest/False Imprisonment.**

To establish a false arrest or imprisonment claim, a plaintiff must show "(1) the detention or restraint of one against his [or her] will, and (2) the unlawfulness of such detention or restraint."  *Reed v. City & Cty. of Honolulu*, 76 Haw. 219, 229, 873 P.2d 98, 109 (1994).  "The determination of

probable cause is a defense to the common law claims of false arrest, false imprisonment, and malicious prosecution." *Id.*

As discussed above, the officers had probable cause to believe that Griego and Sanchez had committed burglary. Under Hawaii law, this defeats any claim of false arrest or false imprisonment. *See id.* Accordingly, this court grants summary judgment to all Defendants on the false arrest/false imprisonment claims.

### 3. Summary Judgment Is Granted in Part and Denied in Part With Respect to Negligence Claims Against Individual Defendants and to the Claim of Respondeat Superior Liability Against the County of Maui.

Under Hawaii law, nonjudicial government officials have a qualified or conditional privilege with respect to tortious actions taken in the performance of public duties, unless a plaintiff can establish that the official's conduct was motivated by malice. *Towse v. State*, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982); *Runnels v. Okamoto*, 56 Haw. 1, 4, 525 P.2d 1125, 1128 (1974). This privilege shields all but the most guilty nonjudicial officials from liability, but not from the imposition of a suit itself. *Towse*, 64 Haw. at 631, 647 P.2d at 702. The privilege is the result of the Hawaii Supreme Court's balancing of competing interests. It protects the innocent public servant's pocketbook, yet it allows an injured

party to be heard. *See Medeiros v. Kondo*, 55 Haw. 499, 504, 522 P.2d 1269, 1272 (1974).

For a tort action to lie against a nonjudicial government official, the injured party must allege and demonstrate by clear and convincing proof that the official was motivated by malice and not by an otherwise proper purpose. *Towse*, 64 Haw. at 631-33, 647 P.2d at 702-03; *Medeiros*, 55 Haw. at 504-05, 522 P.2d at 1272. When a public official is motivated by malice, and not by an otherwise proper purpose, Hawaii law provides that the cloak of immunity is lost and the official must defend the suit the same as any other defendant. *Marshall v. Univ. of Haw.*, 9 Haw. App. 21, 37, 821 P.2d 937, 946 (Ct. App. 1991), *abrogated on other grounds by Hac v. Univ. of Haw.*, 102 Haw. 92, 73 P.3d 46 (2003).

Hawaii courts define "malice" as "the intent, without justification or excuse, to commit a wrongful act[,]" "reckless disregard of the law or of a person's legal right[,]" and "ill will; wickedness of heart." *See Awakuni v. Awana*, 115 Haw. 126, 141, 165 P.3d 1027, 1042 (2007). An act performed with malice may be a negligent act. *See Long v. Yomes*, Civ. No. 11-00136 ACK, 2011 WL 4412847, at *7 (D. Haw. Sept. 20, 2011) ("[C]onduct performed with 'reckless disregard of the law or of a person's legal rights' may be negligent, even though negligent conduct

65

often does not involve malice." (citations omitted)). The existence or absence of malice is generally a question for the jury. *Runnels*, 56 Haw. at 5, 525 P.2d at 1129. However, when the existence or absence of malice is demonstrated to the court via uncontroverted affidavits or depositions, the court may rule on the existence or absence of malice as a matter of law. *See id.*

Defendants argue that the officers are entitled to a qualified privilege because Griego and Sanchez do not present any credible evidence to suggest malice. *See* ECF No. 110-1, PageID # 439. They contend that, because the officers arrested Griego and Sanchez based on probable cause and treated them respectfully, the officers did not act with malice. *See id.* Griego and Sanchez, however, maintain that the officers acted with reckless disregard of the law or their rights during their arrests and the searches for guns. *See* ECF No. 116-2, PageID #s 693-95. Griego and Sanchez assert that the officers failed to follow Maui Police Department policies, which they say in itself demonstrates malice and ill-will. *See id.*, PageID # 693.

There is no dispute that the police officers are nonjudicial government officials who are eligible for the qualified or conditional privilege discussed in *Towse*.

Accordingly, to hold the officers liable for the negligence claims, Griego and Sanchez must "prove, to the requisite degree, that the [officers] had been motivated by malice and not by an otherwise proper purpose." *Towse*, 64 Haw. at 631, 647 P.2d at 702.

Because the record reflects that the officers had probable cause to arrest Griego and Sanchez, the court sees no evidence that the officers were motivated by malice in arresting Griego and Sanchez. However, the facts are clearly disputed as to whether rights were violated with respect to the manner of the arrests, particularly in connection with the manner in which Griego and Sanchez were seized in their hotel rooms, taken to the police station, and held until they were released from custody. The facts are also disputed as to how the officers carried out the searches for guns and whether Griego and Sanchez consented to the searches. Genuine issues of material fact exist as to whether the officers acted with malice in the manner of the arrests and the searches for guns, but not as to whether the officers acted with malice insofar as the bases for arresting Griego and Sanchez are concerned.

If a jury concludes that the officers acted with malice and ultimately determines that the officers acted negligently in the manner of the arrests and the searches for

guns, then the jury may also conclude that the County of Maui is liable for the officers' actions in this respect under the doctrine of respondeat superior. *See McCormack v. City & Cty. of Honolulu*, Civ No. 10-00293 BMK, 2014 WL 692867, at *3 (D. Haw. Feb. 20, 2014) (observing that "a claim for respondeat superior cannot survive without an underlying tort claim against an employee"); *see also Wong-Leong v. Haw. Indep. Refinery, Inc.*, 76 Haw. 433, 438, 879 P.2d 538, 543 (1994) ("[T]o recover under the respondeat superior theory, a plaintiff must establish: 1) a negligent act of the employee, in other words, breach of a duty that is the legal cause of plaintiff's injury; and 2) that the negligent act was within the employee's scope of employment.").

Accordingly, with respect to the claim of negligence against the individual officers and the claim of respondeat superior on the part of the County, summary judgment is denied to the extent those claims relate to the manner of the arrests and to the searches for guns. To the extent those claims are based on facts unrelated to the manner of the arrests or the searches for guns, summary judgment is granted on the negligence and respondeat superior claims.

**4.   Summary Judgment Is Granted in Part and
       Denied in Part With Respect to Claims for
       Intentional Infliction of Emotional
       Distress.**

Under Hawaii law, the elements of intentional infliction of emotional distress are "(1) that the act allegedly causing the harm was intentional or reckless, (2) that the act was outrageous, and (3) that the act caused (4) extreme emotional distress to another." *Enoka v. AIG Hawaii Ins. Co.*, 109 Haw. 537, 559, 129 P.3d 850, 872 (2006).  The Hawaii Supreme Court has held that the "term 'outrageous' has been construed to mean without just cause or excuse and beyond all bounds of decency." *Id.*  "Moreover, extreme emotional distress constitutes, *inter alia*, mental suffering, mental anguish, nervous shock, and other highly unpleasant mental reactions." *Id.* (citation and quotation marks omitted).

The officers assert that their actions were not outrageous but rather reasonable and based on probable cause. *See* ECF No. 110-1, PageID #s 436-37.  As to the fact of the arrests, given the existence of probable cause, Griego and Sanchez may not recover for emotional distress.  However, as to the manner of the arrests and the searches for guns, the facts are clearly disputed.  If a jury agrees with Griego's and Sanchez's accounts of their detention and the search, it is presently unclear whether a jury could conclude that the manner

of the arrests and the searches for guns were "beyond all bounds of decency." *See Enoka*, 109 Haw. at 559, 129 P.3d at 872.

Accordingly, this court denies summary judgment on the claim of intentional infliction of emotional distress to the extent any emotional distress relates to any claim that remains for further adjudication. This court, however, grants summary judgment on the claim of intentional infliction of emotional distress to the extent any emotional distress relates to any claim disposed of by this order.

## V.    CONCLUSION.

Defendants' motion for summary judgment is granted in part and denied in part.

Summary judgment is granted as follows:

1.    Granted as to all § 1983 claims in Count 1 against Defendant County of Maui.

2.    Granted as to the § 1983 claims in Count 1 against individual Defendants relating to alleged violations of the Fifth, Eighth, and Ninth Amendments.

3.    Granted as to the § 1983 claims against individual Defendants relating to any alleged violation of the Fourth Amendment concerning the fact of Griego's and Sanchez's arrests.

4.   Granted to all Defendants on the state law claims in
     Count 2 of false arrest/false imprisonment.

5.   Granted to the County on the negligent
     training/supervision/discipline claim in Count 5.

6.   Granted with respect to the claim in Count 4 of
     negligence against individual Defendants and the claim
     of respondeat superior liability on the part of the
     County in Count 6, except to the extent those claims
     relate to the manner of the arrests and any search for
     guns.

7.   Granted as to the claim in Count 3 of intentional
     infliction of emotional distress, to the extent any
     emotional distress relates to matters disposed of by
     this order.

     Summary judgment is denied as to the following:

1.   Denied with respect to § 1983 claims in Count 1
     against individual Defendants alleging Fourth
     Amendment violations relating to the manner of the
     arrests and concerning any search for guns.

2.   Denied with respect to the claim of negligence in
     Count 4 against individual Defendants and the claim of
     respondeat superior liability on the part of the

County in Count 6, to the extent those claims relate
to the manner of the arrests and any search for guns.

3.    Denied with respect to the claim in Count 3 of
intentional infliction of emotional distress, to the
extent that claim relates to any matter remaining for
further adjudication.

As noted in footnote 2 of this order, Fourteenth
Amendment claims are treated here as asserted only for purposes
of showing the applicability of other cited constitutional
amendments against states and municipalities.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 29, 2017.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

*Jason Griego and James Sanchez v. County of Maui; Anselm Yazaki; Aly Miyashiro; Myles S. Won; Doe Officers 2-15*, Civ. No. 15-00122 SOM-KJM, ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.